[No. 1,119.]

## E. P. ATKINS v. ALEXANDER GAMBLE.

SALE OF MINING STOCKS BY BAILEE.—A. and G. each owned shares of stock in a mining company, all the shares being of equal value; A. delivered a number of his shares to G., to be held as collateral security for money advanced by G., to pay assessments upon the stock of A., and to be sold by G. whenever he could obtain not less than five hundred dollars per share; G. transferred certain of A.'s shares for less than the price named, in fulfillment by G. of a contract for a sale of his own stock, and, on settlement with A., G. transferred an equal number of his own shares to A., exchanging receipts with him in full of all demands. Subsequently A. sued G. for the amount of money received for the shares sold, alleging that the settlement had been procured by false representations on the part of G.; and G. defended by showing that he transferred the shares in fulfillment of a contract for the sale of his own stock, and that he at all times had and held for A.'s use an equal number of shares of equal value, and that he had so replaced them. *Held*, that G. did not become responsible for the proceeds of the sale of the shares. The technical breach of trust presents a case of *damnum absque injuria.*

RIGHT OF BAILOR TO DEMAND PROCEEDS OF WRONGFUL SALE.—If the bailee of personal property sell it, in violation of his authority, the owner may ordinarily ratify the transaction and demand the proceeds of the sale.

RIGHT OF OWNER TO RECOVER SPECIFIC PROPERTY.—The owner of personal property which has been wrongfully converted is ordinarily entitled to recover his specific property, or its value, and cannot be compelled to accept other property of the same kind and equal value in lieu of that which was converted.

IDEM.—Shares of stock in a corporation stand upon a different footing, because they are mere evidence of interest in the business of the corporation; and, if all the shares are of equal value, there can be no reason for preferring one share to another.

APPEAL from the District Court of the Fourth Judicial District, City and County of San Francisco.

The facts are stated in the opinion of the Court.

*S. M. Wilson* and *A. P. Crittenden*, for Appellant.

A share of stock in an incorporated company is, in its very nature, incapable of identification. No ear-mark can be placed upon it. One share is as good as another share, all shares being of equal dignity. (*Nourse* v. *Prince*, 4 John. Ch. R. 496; *Arnold* v. *Ruggles*, 1 R. I. 165; Ang. & Ames on Cor., Secs. 557, 558, 560, 561, 562, 565; *Wildman* v. *Wildman*, 9 Ves. 177; *Kerby* v. *Patter*, 4 Ves. 751; *Planter's Bank* v. *Merchant's Bank*, 4 Ala. 753; *Denton* v. *Livingston*, 9 Johns. R. 96; *Hutchins* v. *State Bank*, 12 Metc. 421; *Mechanics' Bank* v. *N. Y. and New Haven R. R. Co.*, 13 N. Y. R. 626, 627; *Collier* v. *Collier's Executors*, 3 Ohio St. R. 374, and cases cited; 2 Hilliard on Torts, 129, et seq.; 1 ib. 55, et seq.; *Weston* v. *Bear River and Am. W. and M. Co.*, 5 Cal. 184; *Stout* v. *Natoma W. and M. Co.*, 9 Cal. 80; *Allen* v. *Dykers*, 4 Hill, 593; *s. c.*, 7 Hill, 498; *Leroy* v. *Eastman*, 10 Mod. 499; *Cruikshank* v. *Turner*, 7 Bro. Parl. C. 255; *Elkins* v. *Macklish*, Amb. 187; *Longton* v. *Waite*, 6 Law Rep. 165; *Gunter* v. *James*, 9 Cal. 660, and cases cited.)

A share means a part. Ten shares out of one hundred shares and ten parts out of a hundred parts mean the same thing. To enter into a contract by which you become entitled to ten parts out of a hundred parts of the profits of an enterprise is the same as ten shares of the stock of the enterprise. If the right to collect one tenth of the profits of a corporation—that is, one tenth of the dividends—be vested in A., and he assigns or transfers that right to an agent, or debtor, or creditor, and he receives back the right to collect one tenth, we perceive no injury.

*E. Casserly* and *W. H. L. Barnes*, for Respondent.

The plaintiff was entitled to have back from defendant the identical shares of stock which he had intrusted to him

for sale. Defendant could not, in lieu thereof, return to plaintiff an equal number of other shares of stock of the same company.

Identity of the thing owned is of the essence of all property under our law. Whatever a party cannot identify as being specifically his in a Court of law, he does not show to be his property. The exception is in the instance of a tortious confusion of chattels, where the law, rather than leave the innocent party without remedy, gives him the whole—an exception which proves the rule. The question of value, whether equal or superior, is an immaterial circumstance, either in respect of the right of property or the defense of a wrong done to it. In the abstract sciences, things equal to the same thing are equal to each other. In the law, which, like the science of government, of which it is an important part, is eminently a practical science, the rule, especially as to questions of property, is emphatically *nullum simile est idem*—whatever is like, is not the same. The element of identity pervades the whole law of sales. To a sale of personal, or even of real property, it is essential that the property shall have been identified, either by a definite description in the case of lands, or by parting it out, or marking it, etc., in the case of chattels. Until this is done no property passes, because without identity there is no property. (Hilliard Sales, second ed. 1860, p. 135–141, and cases in notes; 1 Parsons' Contr., ed. 1866, p. 527.) "The property does not pass absolutely, unless the sale be completed, and it is not completed so long as anything remains to be done * * * to identify the thing sold, or discriminate it from other things." *Bailey* v. *Smith*, 43 N. H. 141–143; *Ockington* v. *Richey*, 41 N. H. 279–281; *Aldridge* v. *Johnson*, 7 Ellis & B. 90 E. C. L. 885, 899–903.) The exceptions to this rule are rather apparent than real, and will be found to refer generally to something else to be done after the identity is ascertained, as measuring, weighing, etc., for the purpose of

fixing the purchase price, etc., or to be the result of express contract. (See, also, *Busk* v. *Davis*, 2 M. & S. 402–406; *Wallace* v. *Breeds*, 13 East, 522; *Shepley* v. *Davis*, 5 Taunt., 617; *White* v. *Wilks*, ib. 176–178; *Gardner* v. *Lane*, 9 Allen, 498, 499.) That the general rule of identity applies to stocks equally with any other species of chattels, is not only clear on principle, but on authority. (*Wilson* v. *Little*, 2 Comstock, 443; *Brookman* v. *Rothschild*, 3 Simmons, 6 Eng. Ch. 153; *Seymour* v. *Wyckoff*, 10 N. Y. 213; *Ford* v. *Hopkins*, 1 Salk. 283; *Parsons* v. *Martin*, 11 Gray, 111; *Markham* v. *Fandon*, 41 N. Y. 235; *Brass* v. *Worth*, 40 Barb. 648; *Gilpin* v. *Howell*, 5 Penn. State R. 57.) Where stock has been wrongfully converted by a trustee, the *cestui que trust* may either compel a redelivery of the stock or claim the value of it at the time of the conversion. (*Hart* v. *Ten Eyck*, 2 Johns. Ch. 117; *Forrest* v. *Elwes*, 4 Vesey, 799; *Bank of Montgomery* v. *Reese*, 2 Casey, 149; *Wilson* v. *Whitaker*, 13 Wright, 117; *Piety* v. *Stace*, 4 Vesey, 622, 623; *Pocock* v. *Redington*, 5 Vesey, 794–800, and note; *Bostock* v. *Blakeney*, 2 Brown's Chancery Cases, 653–657.)

By the Court, CROCKETT, J.:

The legal propositions involved in this case are of great practical importance, and, in arriving at a satisfactory solution of them, we have been very much aided by the able and exhaustive briefs of the respective counsel.

In 1863 the Antelope mine, in Esmeralda District, was owned by an incorporated company, established under the laws of the State, and having its principal place of business at San Francisco. The defendant was President of the company, and the plaintiff was Superintendent of the mine. The interests of the respective stockholders in the company were represented by certificates of stock, in the usual form,

and the plaintiff was the owner of thirty-three and one third shares, represented by six certificates for five shares each, and one certificate for three and one third shares. He was also the owner of certain shares, represented by similar certificates, in the Real del Monte Company, another mining corporation. In order to meet accruing assessments on these stocks, the plaintiff borrowed from defendant a certain sum of money, which was to be refunded, with an agreed rate of interest, and hypothecated the stocks with the defendant as collateral security for the sum advanced and the accruing interest. The certificates were indorsed by the plaintiff and delivered to the defendant. The plaintiff claims that it was agreed that the defendant should sell, for the plaintiff's account, the Real del Monte stock, whenever he could obtain therefor not less than forty dollars per share, and the Antelope stock, when he could obtain for it not less than five hundred dollars per share. Ultimately the Real del Monte stock was sold by the defendant at the price limited, and he received the money therefor, of which fact the plaintiff was duly notified, and no complaint is made in respect to this transaction. The money thus received was not only of sufficient amount to refund the advances made to the plaintiff, with the interest then due thereon, but there remained in the hands of the defendant a considerable excess to the credit of the plaintiff. During all this time the defendant was the owner, in his own right, of a number of shares of stock of the Antelope Company, exceeding in amount the thirty-three and one third shares of the plaintiff. Whilst the plaintiff's certificates for the Antelope stock so remained in the hands of the defendant, the latter sold to Edward Martin ten shares of the stock of that company, for four thousand dollars, being at the rate of four hundred dollars per share, and delivered to Martin, in fulfillment of the contract of sale, ten shares of the plaintiff's stock. The defendant claims that in the sale to Martin he sold his own stock,

and not the plaintiff's; and that he delivered the plaintiff's certificates for the ten shares, instead of his own, only because, being the President of the company, he feared it would depreciate the value of the stock in the market if it should become known that he was selling his own stock; and that he used the plaintiff's certificates under the belief that no damage could result to the plaintiff, inasmuch as he (the defendant) had and continued to have more stock of the same company than was necessary to replace it, which he held for the plaintiff's use in lieu of that delivered to Martin. It further appears that the defendant caused fifteen shares of the plaintiff's stock to be transferred on the books of the company to Donohoe, Ralston & Co., to whom new certificates were issued, and who immediately indorsed the new certificates and returned them to the defendant. It also appears that the defendant on one occasion loaned to Perry, a stock broker, five shares of plaintiff's stock, and within a few days thereafter Perry returned to the defendant another certificate for the same amount of stock. The defendant further claims that after all these transactions he and the plaintiff had a full and final settlement of all matters connected with these stocks; and that after being fully informed of all that the defendant had done in the premises the plaintiff ratified his acts and the parties exchanged receipts.

The complaint, after averring the ownership of the plaintiff of the Antelope stock, and describing the several certificates, alleges that the plaintiff duly indorsed the certificates, so that the title might pass by delivery, and delivered them to the defendant, to hold the same in trust and as agent for the plaintiff, and if sold to be sold for the account and benefit of the plaintiff, and the proceeds to be paid to the plaintiff; that the defendant afterward sold ten of said shares for the market price of four hundred dollars, in gold coin, per share, and received the money therefor, to

and for the use of the plaintiff; that he subsequently sold fifteen of the remaining shares for the then market price of three hundred and forty-five dollars, in gold coin, per share, and received the said sum to and for the use of the plaintiff; that he afterward sold five of the remaining shares at the then market price of two hundred dollars, in gold coin, per share, and received said sum to and for the use of the plaintiff; that the defendant willfully and fraudulently failed and neglected to inform the plaintiff of these sales, and fraudulently concealed said transactions from the plaintiff, and thereby caused the plaintiff to believe that the stock had not been sold; that, being thereby deceived in respect to the facts, the plaintiff afterward paid to the defendant certain sums as and for so much money advanced by the defendant to pay assessments on said stock; whereas, in fact, before the assessments were levied, the defendant had sold said stocks, and had received the proceeds to and for the plaintiff's use; that during all this time the plaintiff was absent from San Francisco, and was ignorant of the dealings of the defendant in said stocks; that ultimately the plaintiff came to San Francisco, and called upon the defendant for a settlement; that the defendant then returned the certificate for three and one third shares, and informed the plaintiff that he could get the residue of his stock at the office of the company, and represented and stated that there had been some manipulation going on, which had made it necessary for him to use the plaintiff's name, but never informed the plaintiff that he had sold the plaintiff's stock, and falsely and fraudulently, and with intent to cheat the plaintiff, induced him to believe, and he did believe, that the plaintiff's stock was at the office of the company, ready to be delivered to him; that thereupon, at defendant's request, the plaintiff took from the company a certificate for thirty shares belonging to defendant, and supposing the same to belong to the plaintiff, being induced and fraudu-

lently persuaded by the defendant to receive the same; and was also compelled to pay to the company seven hundred and fifty-five dollars, as assessment on said thirty shares, before it was delivered to him, which he would not have done if he had known that it was the defendant's stock and not his own; that the defendant had and received the said sums of money as the agent of the plaintiff, and to and for his use; that whilst the plaintiff was ignorant of these facts, and misled and deceived by the statements and conceal- ments of the defendant, the defendant procured from the plaintiff a receipt in full of all demands; that the receipt was obtained by fraud, undue influence, and willful misrep- resentation, and with the intent to secure to the defendant the money received for the thirty shares, etc.; that, on dis- covering the fraud, he demanded payment of the defendant, which was refused. The prayer of the complaint is for a judgment for the several sums received by the defendant, with interest.

The answer admits that the plaintiff owned the thirty- three and one third shares and delivered the certificates therefor, properly indorsed, to the defendant; but avers that they were delivered solely as collateral security for the ad- vances made by the defendant to the plaintiff, and not upon any trust whatsoever; that the defendant was then and there- after a large dealer in the stock of said company, having many shares standing in his own name, and holding many certificates for both large and small amounts, issued to other persons, and properly indorsed, so as to pass by delivery; that desiring to make sale of a portion of his own stock in said company, he ordered his broker to sell the same; and in performing the contract of sale he delivered to the pur- chaser, amongst other certificates, two of those of the plain- tiff for five shares each; that he delivered them as his own certificates, and not as those of the plaintiff; that the con- tract of sale was for his own account and for his own stocks,

and not for the plaintiff, or on his account; that he had then, and has ever since had, other certificates of the same kind, and of the same amount, which he held for the plaintiff, and has at all times been ready to deliver. The answer denies the sale of the fifteen shares and of the five shares, or that the defendant ever received any sum of money therefor; and denies all the fraudulent representations and concealments charged in the complaint, or that the plaintiff was ignorant of the actual facts as they existed. It then avers that, after being fully informed of all the facts, the plaintiff accepted a certificate for the thirty shares, and gave to the defendant a receipt acknowledging payment in full of all demands to that date.

The findings are to the effect:

*First*—That the plaintiff owned the thirty-three and one third shares, for which he held certificates as above stated, which were so numbered as to render them easily capable of identification; and that he also owned one hundred and twelve shares of Real del Monte stock.

*Second*—That in October, 1862, he made an arrangement with the defendant by which the defendant agreed to receive, and did receive, the said stocks for sale under the plaintiff's instructions; and, until the same should be sold, to advance and pay for the plaintiff the assessments levied and to be levied on said stocks, holding the stocks as security for said advances and interest thereon.

*Third*—That up to February 28th, 1863, the defendant had in this manner advanced for the plaintiff about one thousand dollars, on which day the defendant sold the Real del Monte stock for four thousand four hundred and eighty dollars, which he received; out of which he paid himself his advances and interest; and by agreement with the plaintiff, held the balance of three thousand three hundred and seventy-eight dollars and ninety-three cents for the account of the plaintiff and

as a fund from which to pay any assessments to be thereafter levied on the Antelope stock; and the said fund was more than sufficient for that purpose.

*Fourth*—That on the 7th of March, 1863, the defendant wrongfully sold ten shares of the plaintiff's Antelope stock for four thousand dollars in gold coin, which he received and appropriated to his own use; that on the 29th of April, 1863, without the knowledge or authority of the plaintiff, the defendant wrongfully disposed of, to his own use, fifteen other shares of said stock, which was then of the market value of three hundred and forty-five dollars, in gold coin, per share; that on the 19th of February, 1864, without the knowledge or authority of the plaintiff, the defendant wrongfully disposed of, to his own use, five other shares of said stock, which was then of the market value of two hundred dollars per share, in gold coin.

*Fifth*—That the plaintiff never made any ratification, confirmation, or settlement of said transactions, or any of them; that in March, 1864, the plaintiff required of the defendant that he should return to him his thirty-three and one third shares, and account with him for the moneys in defendant's hands; that the defendant did not account with the plaintiff for said moneys, or return said stock; but in lieu thereof returned to him only three and one third shares, and delivered to him an order on the Secretary of the company to transfer on the books of the company to the plaintiff thirty shares of the defendant's stock, on the payment by the plaintiff of seven hundred and fifty dollars in gold coin, being the amount of an assessment alleged by the defendant to be due thereon; and the defendant at the same time handed to the plaintiff three hundred and seventy-one dollars and thirty-nine cents in cash, as and for the balance of the plaintiff's moneys in his hands, alleging that all the rest of the plaintiff's money in the defendant's hands, being three thousand and seven dollars and fifty-four cents, had been applied by

the defendant in payment of assessments on said thirty shares of the plaintiff's stock; that of the said sum, three thousand dollars had not in fact been so applied, and the assessments referred to by the defendant as those on which he had applied the three thousand dollars, were all levied after the periods when he had wrongfully disposed of said thirty shares; that at the defendant's request, receipts in full of all demands, written out by the defendant, were then and there exchanged between the parties; that the plaintiff paid to the company the seven hundred and fifty dollars in gold coin, and had the thirty shares transferred to him on the company's books; that the defendant did not then, or at any time, disclose to the plaintiff the facts, or any of them, specified in the fourth finding, but withheld the same from the plaintiff; and the plaintiff received the thirty shares, paid the seven hundred and fifty dollars and exchanged receipts with the defendant, in ignorance of said facts and by reason of such ignorance; that said facts were not discovered by the plaintiff until about the middle or latter part of June, 1864, when he immediately returned to the defendant the certificate for the thirty shares, and demanded payment of the moneys sued for, which payment was refused, and has never been made.

*Sixth*—That during all the period covered by these transactions the defendant had more than seventy shares of the Antelope stock standing in his name on the books of the company, and owned by him.

*Seventh*—That by the custom of brokers in San Francisco one share of stock is considered of no more value than another share of stock in the same corporation, and that stock brokers frequently exchange certificates for the same number of shares in the same corporation; but neither the plaintiff or defendant was a member of the Board of Brokers, nor were said transactions, or any of them, had with reference to any custom of said Board.

As conclusions of law, the Court finds: 1st, That from October, 1862, to February 28th, 1863, the defendant held the plaintiff's stocks as pledged, and as security for the advances made by the defendant to pay assessments on the stocks; that the bailment by way of pledge terminated on said twenty-eighth of February, after which the defendant sold the Antelope stock as the plaintiff's bailee and agent for the sale thereof, under the plaintiff's orders; 2d, That the custom of the Board of Brokers is irrelevant and immaterial to this case; 3d, That the dealings of the defendant with, and the disposition made by him of the several parcels of said stock, amounting to thirty shares, were wrongful, and were not, any of them, authorized, ratified, or confirmed, nor was any settlement thereof made by the plaintiff, and the plaintiff is entitled to recover the four thousand dollars, proceeds of the sale of ten shares; five thousand one hundred and seventy-five dollars, the value of the fifteen shares; one thousand dollars, the value of the five shares; three thousand three hundred and seventy-eight dollars and ninety-three cents, the balance of plaintiff's money remaining in defendant's hands (less the three hundred and seventy-one dollars and thirty-nine cents paid to the plaintiff); and the seven hundred and fifty dollars paid by the plaintiff to the company; the whole sum for which judgment is ordered being thirteen thousand nine hundred and thirty-two dollars and fifty-four cents, with interest from July 1st, 1864, of which sum, seven thousand dollars and the interest thereof, is to be paid in gold coin. Judgment was entered for the plaintiff in accordance with these findings, and the defendant moved for a new trial, on the ground, amongst others, that the evidence was insufficient to support the findings, and the statement in support of the motion contains the proper specifications in that respect. The motion for a new trial was denied, and defendant has appealed.

We have been thus minute in stating the pleadings and findings, in order to avoid any misapprehension as to the precise points to be decided on the appeal.

In respect to many of the controlling facts of the case, there is little or no contrariety in the evidence. As to the ten shares of Antelope stock, the only testimony concerning the sale of them by the defendant was to the effect that the defendant, being the owner in his own right of a large amount of the stock of that company, ordered his broker to sell a portion of it; that the broker contracted to sell twenty or more shares to Edward Martin, and in performing the contract of sale the defendant, who was President of the company, delivered to Martin ten shares of the plaintiff's stock; that in so dealing with these shares the defendant delivered them as his own, and not as the property of the plaintiff; that the sale to Martin was intended by the defendant to be of his own stocks, and not the plaintiff's; and that the defendant, during the whole time, held in his own name more than enough of the stock of the company to replace the ten shares of the plaintiff.

The argument of the counsel for the plaintiff on this branch of the case is, that inasmuch as the defendant sold these ten shares without the authority of the plaintiff, and against his orders, it was a wrongful conversion of the stock by the defendant to his own use; that it was optional with the plaintiff whether he would repudiate the sale and hold the defendant for the market value of the stock, or, waiving the wrongful conversion, ratify the sale and demand the proceeds.

There can be no doubt as to the general proposition that, if the bailee of personal property sell it in violation of his authority, the owner may ratify the transaction and demand the proceeds of the sale. If A. intrust to B. a steamboat, for sale at a limited price, and if B., in violation of his duty, sell it for a less price, A. may acquiesce in the sale and

demand the proceeds. This proposition needs no argument or citation of authorities to sustain it. It would not be at the option of the bailee whether he would account for the proceeds or deliver another steamboat of equal value; nor would it be any defense for him to say that he, at all times, had and held another steamboat of equal value, which he was ready to deliver in place of the first. If certificates of stock in mining corporations are to be treated in this respect as other personal property, it is evident the defendant became liable to the plaintiff for the proceeds of the ten shares sold to Martin.

But we think such certificates stand upon a different footing. Whilst stock in corporations is denominated personal property, and is subject to seizure and sale under execution, and whilst a particular certificate may be capable of complete identification, by its numbers or otherwise, the certificate is but the evidence that the holder of it is entitled to an undivided share in the assets and business of the corporation. The stockholders are the joint owners of the franchise and property of the corporation, each being entitled to an undivided share thereof, and the only office of the certificate is to furnish the evidence of the quantum of interest held by the owner of the certificate. " Certificates of stock are not securities for money in any sense; much less are they negotiable securities. They are simply the muniments and evidence of the holder's title to a given share in the property and franchises of the corporation of which he is a member." (*Mechanics' Bank* v. *New York and New Haven Railroad Company*, 13 N. Y. R. 626.)

If a firm, doing business as an ordinary partnership, issue certificates to each of its members, specifying the interests of the respective copartners, such certificates would have no intrinsic value, except as evidence of the *quantum* of interest of each copartner. The joint interest of the copartner in the property and business of the firm is the substance, of

the existence of which the certificate is but the evidence. If, for example, there be three copartners, each owning an undivided interest of one third, there is no appreciable difference between the respective interests. They are in all respects precisely similar, and each several interest is an exact duplicate of the others. The same principle is applicable to corporations. The holder of ten shares of stock stands precisely upon the same footing as any other holder of ten shares. Their interests are precisely similar, and of the same value, and each holds but an undivided interest in the common property. This proposition is not new in this Court, and is substantially decided in *Hawley* v. *Brummagim*, 33 Cal. 394; *Hardenburgh* v. *Bacon*, 33 Cal. 356.

The general rule is, as we have stated, that the owner of personal property which has been wrongfully converted, is entitled to recover his specific property or its value, and cannot be compelled to accept other property of the same kind and of equal value, in lieu of that which was converted. The reason of the rule is obvious. The owner may have special reasons for desiring to retain that specific chattel; and there may be reasons why he attached a peculiar value to it beyond the value of other chattels of a precisely similar kind. If his desire in this respect be the result of mere caprice, he is entitled to be gratified in the exercise of it. Visible, tangible chattels may have secret defects which no vigilance could detect. If two visible objects be apparently precisely similar, one may have infirmities not discoverable on inspection, which would impair or destroy its value. Hence the owner of such chattel cannot be compelled to accept in lieu of it another which appears to be precisely similar and of equal value. He cannot be required to take the risk of secret defects in the substituted article. Other considerations, also, affect the general rule. If a favorite horse, a pet dog, or a family picture be converted by a wrongdoer, he could not escape

responsibility by offering another horse, dog, or picture, even of greater value.

But we think the reason of the rule ceases when applied to stocks. It is impossible that any sane person should have centered his affections upon a particular stock certificate, or that any violence could be done to his feelings by requiring him to accept another certificate of precisely similar character, in lieu of it. His own certificate was only the evidence that he owned an undivided interest in the capital and business of the corporation. Another certificate of the same kind, for the same amount of stock, would entitle him to precisely the same rights as the former certificate. Each would be a precise equivalent of the other, and it is certain he could suffer no pecuniary loss by the transaction; whilst the nature of the property, or rather of his interest in it, forbids the idea that it could be the object of personal attachment, or have a peculiar value in his estimation as contradistinguished from any other equal number of shares in the same company.

For these reasons, we think, a different rule should govern the conversion of a certificate of stock; and if the wrongdoer was at all times ready and willing to transfer to the owner an equivalent number of similar shares in the same company, by a proper and valid certificate, it would present a case for nominal damages only.

Inasmuch as we have been referred to no adjudged case precisely similar to this, and the question involved being one of great practical importance, we propose to notice briefly the authorities relied upon.

*Wilson* v. *Little*, 2 Comst. 443, cited by the plaintiff's counsel, was an action to recover the value of fifty shares of New York and Erie Railroad stock, deposited with the defendant as collateral security to secure the payment of a promissory note, with authority to sell the stock on non-payment of the note. The defendant sold the stock before maturity of the

note, and the plaintiff afterwards tendered payment and demanded a return of the stock. It appears the company had two kinds of stock, for which it had issued certificates; one termed the "consolidated," and the other the "converted," which had different values in the market, the former being the most valuable. The stock which was pledged was the "consolidated," and the defendant offered to return "converted" stock in lieu of that which he sold. The Court very properly held that the plaintiff was under no obligation to accept a different kind of stock from that which was pledged.

In discussing this branch of the case, the Court say: "The defendants were bound to restore the identical stock pledged." And in another part of the opinion: "Although the plaintiff was strictly entitled to a retransfer of the same shares which were pledged, it appears that his broker was willing to receive other stock of the same description and value," etc. In the first paragraph quoted we understand the Court to refer to "consolidated," as contradistinguished from converted stock; but if it be conceded that in strict law the plaintiff was entitled to a retransfer of the same identical shares which were pledged, it by no means follows that he was entitled to any but nominal damages, if the defendant was at all times ready and willing to transfer to him an equal number of shares of the same kind of stock with that which was pledged.

*Brookman* v. *Rothschild*, 3 Simmons, 6 Eng. Ch. 153, was a bill in chancery to set aside certain transactions in stocks on the ground of fraud. The defendant was the plaintiff's agent, and rendered accounts showing large transactions in stocks for the plaintiff's account. It appeared on the trial that the stocks stood in the name of the defendant, and were never in any manner appropriated or set apart to the plaintiff. The Court held that the stocks never became the prop-

erty of the plaintiff, and he was therefore not liable for losses incurred by the sale of them.

*Seymour* v. *Wickoff*, 6 Seld. 213, was an action to recover the value of a quantity of pork in barrels, left with the defendants as commission merchants, for sale, and which was sold at ten dollars per barrel; but the plaintiff was not advised of the sale, and afterwards, on discovering it, brought an action for the proceeds. The defense attempted to be set up was that the pork in question was only a portion of a much larger quantity belonging to the defendant, or consigned to him by others, and which had the same inspection brand, and was stored in the same warehouse, by reason of which it had lost its identity, like wheat mixed in a bin, and that so long as the defendant had on hand an equal quantity of pork of the same brand, he might apply the plaintiff's ownership to that parcel, and sell it on his account. This defense was held to be insufficient, as it manifestly was. But there is no analogy between pork in barrels, capable of complete identification, and having peculiar qualities, on which its value depends, and certificates of stock, having no value over other similar certificates for the same stock.

In *Ford* v. *Hopkins*, 1 Salk. 283, the plaintiff had delivered certain lottery tickets to a goldsmith to collect the money due on them. The goldsmith, having received of the defendant other tickets in the same lottery, and given his note for them, took up his note by delivering the plaintiff's tickets to the defendant.

The Court held that the goldsmith had no authority, except to receive the money due on the tickets, and had no power to sell them or exchange them for other tickets; consequently, no title passed to the defendant.

*Nourse* v. *Prime*, 4 John. Ch. R. 496, and which was more fully considered in 7 John. Ch. R. 87, is, in some respects, very similar to this case. The defendants were stock brokers, and had purchased for the plaintiff four hundred and

thirty shares of United States Bank stock, and taken a transfer of the stock in their own names. The plaintiff having become largely indebted to the defendants, executed his promissory note to them for the amount, and agreed that they should hold the bank stock as collateral security; and the defendants thereupon executed and delivered to the plaintiff a writing, acknowledging that they held the stock as security for the note, and promising, on payment of the note, to "retransfer" the stock and account for the dividends; but, in case the note was not duly paid, the defendants were to be at liberty to sell the stock, accounting to the plaintiff for the surplus, if any.

The defendants ultimately sold the stock at a depreciated price, which was not sufficient to pay the debt, and brought an action at law against the plaintiff for the deficiency. The plaintiff then filed this bill in equity, to enjoin the action at law, on the ground that the defendants were large operators in stocks, and had mingled his stock with their own and other stocks which they held in trust, in such manner that they could not be distinguished; that it was the duty of the defendants to have set apart the plaintiff's shares in such manner that they could be identified, and not having done so, they were liable for the highest price at which the stock could have been sold.

The defendants relied for their defense on the fact that the plaintiff had never requested them to set apart any particular four hundred and thirty shares, and that the custom was for brokers to keep all stocks of which they had control in their own names, not distinguishing one parcel from another; and that they at all times had enough of the stock of the United States Bank under their control to have replaced the plaintiff's stock, and were at all times ready and willing to do so on payment of the note. Chancellor KENT, in delivering his opinion in the case, puts it upon the ground that under the contract all that the plaintiff could

demand was a return of four hundred and thirty shares of the stock of the bank, and if he desired to have any specific four hundred and thirty shares he should have so provided in the contract. He quotes, with approbation, the case of *Le Croy* v. *Eastman*, 10 Mod. R. 499, as follows:

"Here the defendant held £990 in South Sea stock, in trust for the plaintiff. The stock stood in his name, and he gave a note declaring the trust. Five hundred pounds of it was afterwards transferred to the plaintiff, and a bill was filed, for an account for the residue, at the then price of stock. The defendant admitted in his answer that he had morgaged £1,000 of stock, and sold out all the stock in his own name, except £80; but he had more than enough in another person's name to have answered the trust, if the plaintiff had insisted upon a transfer; and he offered the residue of stock due to the plaintiff, amounting to £490, with the dividends. Lord Chancellor PARKER held that the defendant was accountable only for the stock and dividends, and not for the price at which the stock was held. He observed that, as £100 South Sea stock was not to be 'specificated' from another, equity will never adjudge a man to have broken his trust in a higher degree when he may with equal reason be admitted to have broken it in a lower, and that the stock morgaged must be esteemed the stock of the plaintiff, and the stock sold that of the defendant."

The cases of *Horton* v. *Morgan*, 4 Duer, 56, affirmed in 19 New York, 172, *Gilpin* v. *Howell*, 5 Penn. St. R. 42, and *Allen* v. *Dykers*, 4 Hill, 593, sustain the general proposition decided in *Nourse* v. *Prime*.

But in all these cases the stock stood in the name of the bailee, and it is claimed that the cases turned chiefly on this fact, and on the course of dealing between the parties,

which established an implied agreement that the bailee might use the stocks as his own, and replace them with other similar stocks. But we do not so understand the cases; nor do we perceive any difference in principle between stocks standing in the name of the bailee and those standing in the name of the bailor, who has delivered to the bailee his certificates properly indorsed, and thereby placed it in the power of the bailee to transfer them into his own name at any time.

We hold, therefore, both upon reason and authority, that by the delivery to Martin of ten shares of the plaintiff's stock, the defendant, on the facts proved and found, did not become responsible to the plaintiff for the proceeds of the sale.

The same general principle applies to the transfer of the fifteen shares to Donohoe, Ralston & Co., and the loan of five shares to Perry. The defendant was at all times able, and ready, and willing to transfer to the plaintiff the same number of shares of similar stock of the same company, and which had precisely the same value; and it is evident that if the defendant, in these transactions, committed a technical breach of his trust, it presents a case of *damnum absque injuria.*

"It is a good defense, or rather a good excuse, that the misconduct of the agent has been followed by no loss or damage whatever to the principal; for then the rule applies that, although there is a wrong, yet it is without any damage, and to maintain an action both must occur; for *damnum absque injuria* and *injuria absque damnum* are in general equally objections to any recovery." (Story on Agency, Sec. 236.)

The view we have taken of the case renders it unnecessary for us to discuss the sufficiency of the pleadings to support the judgment, or the question of ratification.

Judgment and order denying new trial reversed, and cause remanded for a new trial.

[The foregoing opinion was delivered at the April Term, 1868. A rehearing was granted, and at the October Term, 1871, the following opinion was given:]

By the Court, CROCKETT, J.:

The questions of law presented on this appeal are extremely perplexing and difficult of solution. But after a careful reëxamination of the points involved we adhere to the views expressed in the opinion heretofore delivered in the cause, which will stand as the opinion of the Court.

Judgment reversed and cause remanded for a new trial.