[No 3,918.]

ROBERT A. THOMPSON, as Assignee of Joseph L. King, Bankrupt, v. HUGH H. TOLAND, Administrator with the will Annexed of the Estate of John Sime, Deceased; P. J. WHITE and C. H. BRADFORD, as Trustees of the Estate of John Sime & Co.; BENJAMIN F. HASTINGS, as Surviving Partner, and BENJAMIN F. HASTINGS, Individually, doing Business under the name of John Sime & Co., Bankrupts; JOSEPH M. DOUGLAS, and BENJAMIN F. HASTINGS.

Sale of Mining Stocks.—If the owner of mining stocks allows his broker, who purchases for him, to hold the certificates in such a manner that they will pass by delivery on the endorsement of the broker, with nothing on the face of the certificates to indicate that the real owner has any interest in the stock, a purchaser in good faith from the broker, without notice of the rights of the real owner, acquires a good title to the same, even if the broker, by a contract with his principal, had no right to sell or hypothecate the stocks without the consent of his principal.

Idem.—In this State, mining stocks properly endorsed pass by delivery; and if the true owner places them in the hands of another, on some secret · trust between them, without anything on the face of the certificates to show his ownership, he, and not an innocent purchaser or pledgee, must bear the loss.

Word "Trustee" in Certificate of Stock. —The addition of the word "trustee," in a certificate of stock, to the name of the person to whom it is issued, does not show that such person has not the full right to deal with it as his own, nor give the person dealing with him notice that any other person has any interest in the same.

Statement of Facts.

Acquiring Interest of Pledgor in Stock.—If the person who holds mining stock in secret trust for another, pledges the same for a debt of his own, and the United States District Court, upon the bankruptcy of the pledgor, holds the transaction a fraud on the Bankrupt Law, and compels the pledgee to account to the assignee of the pledgor for the value of the same, and renders judgment against the pledgee, and the pledgee pays the judgment, he thereby acquires the title of the assignee and pledgor, to the stock.

Idem.—Though such pledge may be a fraud under the Bankrupt Law, as between pledgor and pledgee, it is nevertheless valid, as between the pledgee and *cestui que trust.*

Conversion of Stocks by Pledgee.—If one who holds mining stocks in secret trust for another, pledges the same for his debt, without notice to the pledgee of the interest of the *cestui que trust*, and the pledgee sells the stock without previous demand and notice, the right of action for the conversion is in the pledgor, and not in the *cestui que trust.*

Idem.—If, in such case, the *cestui que trust* has a cause of action outside of the contract of pledge, he must first pay or tender the money for which the stocks were pledged.

Verdict against Evidence.—A verdict will not be set aside as contrary to the evidence, where there were but two parties to the transaction, and one of them is dead, and the survivor, the only witness, is contradicted on other matters, and does not testify positively as to the existence of the fact on which the jury found.

Redemption of Stocks Pledged.—The pledgee of mining stocks, upon a redemption of the pledge, is not obliged to return to the pledgor the identical certificates pledged, but may return certificates corresponding to those received.

Idem.—The mere fact that the pledgee of mining stocks sells the particular certificates pledged, does not render him liable as for a conversion of the pledge, provided the pledgee, upon a redemption, restores similar certificates, and has been at all times ready to do so.

Action by Pledgee for Conversion of Pledge.—The pledgee, as against a stranger to the pledgor and wrong doer, who has converted the pledge, may recover its full value; for he is answerable over to the pledgor for any surplus in his hands; and if he recovers in such action, and the wrong doer satisfies the judgment, he thereby acquires a title to the pledge.

Proceedings in Bankruptcy as Evidence.—In an action by the assignee in bankruptcy of a *cestui que trust* of the pledgor, brought against the pledgee, to recover the pledge or its value, where the trust was secret, and no offer was made to redeem the pledge, proceedings in the United States District Court on the bankruptcy of the *cestui que trust* are admissible in evidence on behalf of the defendant.

Appeal from the District Court, Twelfth Judicial District, City and County of San Francisco.

The case was thus: Tilden & Breed were brokers in San

Francisco, and engaged in buying mining stocks on commission for others, and when they loaned a portion of the money to make a purchase, were in the habit of keeping the stock purchased as their security. Joseph L. King employed them as his brokers, to buy mining stocks, and entered into a contract with them, which is contained in the following letter:

" SAN FRANCISCO, March 21, 1868.

*Joseph L. King, Esq.*, Virginia:

Dear Sir—In conversation between yourself and our Mr. Tilden, a few days since, certain general arrangements were made as a basis upon which our business relations should be conducted. In order to prevent any possible misunderstanding of the same in the future, we deem it best to state what is our understanding of the position which we relatively occupy towards each other as agent and principal.

1. We to buy and sell stock in such manner as you may direct, for your account; our brokerage to be: On purchases or sales from one dollar to ninety-nine dollars inclusive, one half the commissions of the San Francisco Stock and Exchange Board. On purchase or sales at or over one hundred dollars, one half per cent. on amount.

2. You to have an overdraft, not to exceed twenty-five thousand dollars, on us, the amount of overdraft to be secured by mining stocks or other collaterals, at a margin of fifty per cent. on purchase-money. Interest the same as charged us by the bank.

3. When margins on any stock are exhausted, we to have the privilege of telegraphing to you for additional deposit; (in which case you would be justified in calling upon your principal.)

4. Upon your being advised of purchases, you will remit fifty per cent. of the amount of purchase, we to retain the stock; except when you desire the stock sent you, you will so telegraph, and we draw against you for full amount, and except when there is a balance with us in your favor, either from sales or otherwise, you will remit only the difference between your credits and fifty per cent. of purchases.

5. On all time purchases or sales with money deposits, you to remit the twenty per cent., or the same to be deducted from your credit balance.

6. Telegrams to be at your expense and risk, except when it is our error, when we are charged with the same, and except upon telegraphic charge on your remittance, which we also pay. Any errors resulting from deficiencies in telegraph office to be at your risk. Profit or loss to be yours; we to be accountable only for such mistakes as are made in our own office. Cost of stamps and discount on exchange drawn against you to be yours.

We have given in the above, our understanding of the terms upon which we are to transact your San Francisco business. The accounts will be sent you twice in each week on specified days. In all business transactions we are to be considered as simply agents for you—you to be our principal. Should the proposition above stated be the same as you understand as the basis of our correspondence, please signify your acceptance of the same. If there be any omission or discrepancy, please notify us at an early date. At the commencement of our business, we hope you will make your overdraft as light as possible, as money is quite tight just now, and we are using quite a large amount at present in our own business.

We omitted to state that all purchases and sales shall be considered "regular," *i. e.* settled next day, so you can remit or draw on the morning next succeeding the day of transactions. If we sell s-3, you will have credit the day after the sale; if we buy cash, or buy s-3, and the stock is delivered same day, you will not be charged until the day after.

Hoping to hear from you at an early day,

We remain your obedient servants,

TILDEN & BREED."

Under the agreement, Tilden & Breed bought mining stock for King when he directed, furnishing a portion of the money, and keeping in their possession the stocks purchased. The certificates were issued by different mining corporations, and were in the following form:

" Certificate 962.    No. shares, 10.

"SAN FRANCISCO, May 28th, 1868.

"Crown Point Gold and Silver Mining Company.

"This certifies that Joseph Tilden —— is entitled to ten shares of the capital stock of the Crown Point Gold and Silver Mining Company. Transferable on the books of the Company by indorsement hereon, and surrender of this certificate.

"CHARLES E. ELLIOT, Secretary.

"A. HAYWOOD, President."

Most of the certificates had the word "trustee" inserted in the blank after the name of the person to whom issued. On the back of each certificate was the following:

"For value received, I do hereby sell and assign unto —— —— shares of the capital stock of the within Company, standing in my name on its books.

"Witness my hand this —— day of —— 186—."

The certificates of stock purchased by Tilden & Breed for King were issued by different mining corporations, and were issued to several persons. On the 31st day of August, 1868, Tilden & Breed failed, and were indebted to John Sime & Co., bankers, composed of John Sime, B. F. Hastings and Joseph M. Douglass, about thirty-five thousand dollars. They had mining stocks in their hands purchased for King, and had King's note for the balance he owed them. To secure Sime & Co. they assigned to them the stocks they had purchased for King, by filling up the blank indorsement on the back, and delivered the same, and also King's note to Sime & Co. Before this assignment was made, Sime & Co. were informed that Tilden & Breed had pledged the stocks to F. Livingstone, as security for a loan of about nine thousand dollars; and, in order to obtain the stocks, Sime & Co. allowed Tilden & Breed to draw a check on their bank for the amount due Livingstone, which they certified, and with this check Livingstone was paid, and the stocks were delivered to Sime & Co. September 1, 1868, King called on Sime & Co., and asked to see the stocks. They were shown to

him, when he informed them that the stocks were bought for him by Tilden & Breed. Sime & Co. declined to recognize him as having any interest in the stocks. All the certificates of stock, except five shares of Belcher, and four shares of Gould & Curry, which were issued to King, and by him endorsed, and fifteen shares of Crown Point, which were issued to Tilden, stood in the names of various persons, and were by them endorsed, and none of them indicated upon their face that any person other than the possessor was the owner. King resided in Virginia, in the State of Nevada, and sent his orders to San Francisco for the purchase of the stocks. King became insolvent, in July, 1868, and on the 4th day of August, 1868, settled with Tilden & Breed, and gave them his note for the balance due, twenty-nine thousand four hundred and eighteen dollars and six cents. This note Tilden & Breed, between the 1st and 5th of September, 1868, delivered to Sime & Co. as collateral security for their debt. On the 7th of December, 1868, Tilden & Breed filed their petition in bankruptcy in the United States District Court. April 21, 1870, H. C. Hyde, their assignee, brought suit against Sime & Co. to recover the stocks or their value, as the property of Tilden & Breed, converted by Sime & Co. to their use, in fraud of the creditors. June 15, 1871, that Court gave judgment in favor of Hyde for four thousand one hundred and thirty-eight dollars and fifty cents. Sime & Co. paid the judgment September 4, 1871. King was adjudged a bankrupt in the United States District Court, on the 6th day of June, 1871, and the plaintiff in this action was appointed his assignee. No offer was made to pay to Sime & Co. King's note, or the money they paid Livingstone, or the amount ($35,843 38) which Tilden & Breed owed them. The complaint in this action was filed October 5, 1871, and after Sime and Hastings had appeared in the action; and on the 13th day of October following, Sime died, and defendant Toland was appointed the administrator of his estate. The administrator was made a party to the action. The stocks were worth about two hundred thousand dollars when the suit was commenced. On the

14th day of November, 1871, Sime & Co., Benjamin F. Hastings, surviving partner, and individually doing business under the name of John Sime & Co., were, on the petition of creditors, adjudged bankrupts, and in December, 1871, defendants White and Bradford were appointed trustees in bankruptcy of the estate of the bankrupts. The defendants recovered judgment in the Court below, and the plaintiff appealed.

The other facts are stated in the opinion.

*James L. Crittenden,* for the Appellant.

The Supreme Court in *Andrews* v. *Clerke,* a suit against brokers for value of stocks and bonds, bought for plaintiff on a margin and sold without due notice, says:

"When the stocks and bonds had been purchased by Wm. B. Clerke & Co., they were, as between them and the plaintiff, the property of the latter. The firm, by the agreement, had a right to retain and sell them, when the time arrived at which they were authorized to sell. * * The substance of the transaction is the same as if the plaintiff had himself made the purchases, and borrowed of the said firm the money required to pay for them, and then, to secure the defendants, transferred the stock and bonds to them upon the same agreement as to holding and selling them." (*Andrews.* v. *Clerke,* 3 Bosworth, 590; *Clarke* v. *Meigs,* 22 How. Pr. R. 340; *Brass* v. *Worth,* 40 Barb. 648; *Taylor* v. *Ketchum,* 5 Robertson, 507; *Read* v. *Lambert,* 10 Abb. Pr. R. N. S. 428, 1871; *Morgan* v. *Jaudon,* 40 How. Pr. R. 366, 1869; *Markham* v. *Jaudon,* 41 N. Y. 235, 1869.)

The Court of Appeals of New York in the case of *Markham* v. *Jaudon,* 41 N. Y. 235, decided, December, 1869, (a case identical with the last), in a most able and elaborate opinion, approve and sustain the decision and opinion in the case of *Brass* v. *Worth.* They also declare in the more recent case of *Morgan* v. *Jaudon,* 40 How. Pr. R. 366, the same to be the settled law in the State of New York.

In *Anderson* v. *Nicholas,* 5 Bosworth, 121, which was an action for damages for conversion of plaintiff's stock

(evidenced by certificates endorsed in blank) by a defendant, who was a *bona fide* purchaser for value without notice, the Court say:

"The defendant has in fact received the certificate of the plaintiff's stock; he has employed third persons to sell it for him; it has been sold in obedience to his instructions; he received the proceeds of the sale; and he is not protected by any legal authority to do the acts so performed. This makes him liable to the owners of the stock. He has dealt with their property without their consent, and received the proceeds on a sale made by his direction. Assuming that he acted in good faith, in the belief that the stock, when he caused it to be sold, belonged to Bowen, is not sufficient to protect him. One who deals with or disposes of the property of another, the same not being negotiable, must see to it that he acts by authority of one who has title, or who has authority to confer sufficient to warrant such dealing or disposition."

In *Read* v. *Lambert*, which was a suit for value of bonds bought by defendants as brokers for plaintiff, on a margin of ten per cent., and sold without orders or notice, the Court say:

"The testator contributed some money toward the purchase, but the larger portion of the price was advanced by the defendant. The legal title was in the testator." (*Read* v. *Lambert*, 10 Abb. Pr. R. N. S. 428, 1872.)

"A certificate of stock is not necessary to constitute a stockholder; it is only the evidence of the stock, and we are not aware of any provision of law requiring that the owner of stock should have a certificate thereof to entitle him to vote at an election of directors of the corporation."

Lord Ellenborough, one of England's ablest and most learned jurists, held that an appropriation of property by a broker to his employer vested title in the employer, though it did not appear to the public at large; and that a pledge of such property by broker for advances gave no rights as against the employer of the broker. (*McCombie* v. *Davies*, 6 East, 588.)

We understand the burden of proving that Sime & Co.

are such purchasers is upon the defendants. To establish this defense it is necessary that they should show, first, their *bona fides;* second, that they purchased; third, that such purchase was for value; fourth, that such purchase was made and purchase-money actually paid without notice.

This doctrine of protection of innocent purchasers for value without notice is a creature of equity origin. (*Boone* v. *Chiles,* 10 Pet. 210; *Morse* v. *Godfrey,* 3 Story's R. 390.) The defendants plead that Tilden & Breed were indebted to them in a large sum of money, and that they received the stocks sued for " as collateral security for the payment of said indebtedness." It is nowhere set up or alleged by the defendants that they paid any money for, or made any advance upon the stocks. It is true that it is alleged that they paid a debt of T. & B. to Livingstone, but they say that it was done at the request of one Newcomb, and do not allege or pretend to allege that the stocks were either sold or pledged to them for the money so paid; but allege the contrary, by stating that they were received as collateral security for the antecedent indebtedness. Intendments are against the pleader. The utmost that the defendants have claimed is that they were pledgees of the stocks for T. & B.'s pre-existing debt to them. As a pledge is not a sale, and as there must be a sale before there can be a purchase, it is obvious that the defendants were not purchasers. The position of a person receiving personal property as a pledge from an agent who is merely authorized to sell, is fully settled in this State by the case of *Wright* v. *Solomon,* 19 Cal. 64. The Court there decided that the owner could recover his property from the pledgee, even though the pledgee had made large advances of money at the very time of receiving the property, and although he believed the pledgor to be the owner. And this is the settled law in England, in all of the States, and in the United States Courts. This very question, as to stocks pledged for an advance of five thousand pounds was determined in the case of *De Bouchout* v. *Goldsmith,* 5 Vesey, Jr., R. 211. A number of cases supporting this rule are given above.

The non-negotiability of certificates of stock was distinctly asserted and maintained in the following cases: *Anderson* v. *Nicholas*, 5 Bosworth, 121, 1859; *Anderson* v. *Nicholas*, 28 N. Y. 600, 1864; *Mechanics' Bank* v. *N. Y. & N. H. R. R. Co.*, 13 N. Y. 627, 1856; *McCready* v. *Rumsey*, 6 Duer's R. 574, 1857; *Bank of Attica* v. *Manufacturers' and Traders' Bank*, 20 N. Y. 507, 1859; *Nesmith* v. *Washington Bank*, 6 Pick. 327, 1828; *Quiner* v. *Marblehead Social Ins. Co.*, 10 Mass. 482, 1813; *N. Y. & N. H. R. R. Co.* v. *Schuyler*, 34 N. Y. 30, 1865; *Comeau* v. *Guild Farm Oil Co.*, 3 Daly, 218, 1850.     Tilden & Breed, being simple agents, with no other authority than to sell when ordered by King to do so, could not barter or pledge King's shares of stock. Any pledge of them by Tilden & Breed would be tortious, and the holding of the pledgees would be tortious.   A tender would in such case be clearly unnecessary.   A mere agent, with power to sell property, cannot pledge the same even for advances at the time of delivering the property in pledge.   (*Wright* v. *Solomon*, 19 Cal. 64; *Warner* v. *Martin*, 11 How. U. S. R. 209; Story on Agency, Sec. 113; 2 Kent's Com. 4 Ed. p. 625; Crump on Sale and Pledges, 1872, p. 4 to 8; *McCombie* v. *Davies*, 7 East, 5; *Patterson* v. *Tash*, 2 Strange, 1178, 1742; *De Bouchout* v. *Goldsmith*, 5 Vesey, Jr. 211, Stocks pledged; *Guichard* v. *Morgan*, 4 Moore, 36, 1819; *Gill* v. *Kymer*, 5 Moore, 516, 1821; *Bragg* v. *Meyer*, 1 McAllister, 408, 1858.)   Still less could the agent pledge when his power was merely to hold and sell only when ordered by the principal.   Such was the position of Tilden & Breed under their contract.   If Tilden & Breed had a lien on the stocks for their advances, the lien was a personal one and could not be transferred to another person.   Such a transfer would terminate the lien and release the property from any claim on account of such lien.   This proposition of law is too well settled to require argument, and we merely refer to a few of the many authorities which establish it.   (*Daubigny* v. *Duval*, 5 Dunford & East's R. 606; *McCombie* v. *Davies*, 7 East, 5; *Scribner* v. *Maston*, 11 Cal. 303.)

*Calhoun Benham*, also for the Appellant, confined his opening argument to questions arising upon the issues raised in the pleadings, and to the special issues submitted to the jury, and their findings thereon, and to alleged errors in admitting and refusing evidence.

*G. W. Gordon* and *Williams & Bixler*, for Respondent Toland ; *John B. Harmon* and *Williams & Thornton*, for the other Respondents.

Tilden & Breed having transferred to Sime & Co., King's note for twenty-nine thousand four hundred and eighteen dollars and six cents, and accompanying stock, as security for the debt of Tilden & Breed to Sime & Co., no action lies against Sime & Co. for the stocks, without first paying or tendering to them the amount of said note; and this, independent of the negotiability of the certificates of stock, and independent of King's ownership, or Sime & Co.'s notice thereof, which in this branch of the case, is a false quantity. (Tyler on Usury, Pledges and Pawn, pp. 567 to 574, inclusive; Schouler on Personal Property, 523, 4, 5; *Halliday* v. *Holgate*, 3 Exqr. L. R. 299; *Donald* v. *Suckling*, 1 L. R. Q. B. 584; *Lewis* v. *Mott*, 36 N. Y. 395; *Johnson* v. *Stear*, 15 C. B. Rep. N. S. 336; or 109 E. C. L. Repts. 330; *Bloxum* v. *Saunders*, 4 Barn. & Cress. 941; *Winks* v. *Hassall*, 9 Barn. & Cress. 372; *Jones* v. *Rahilly*, 16 Minn. 321; *Jarvis* v. *Rogers*, 13 Mass. 105.) Sime & Co. having paid Livingstone nine thousand one hundred and forty-four dollars, for which most of the stocks in controversy were pledged to him by Tilden & Breed, became subrogated to his rights, which was that of a holder for value without notice, and no action lies against Sime & Co. for the stocks without payment or tender. This, too, regardless of the question of notice of the equitable rights, if any, in King. (Same authorities cited.)

The stocks were transferable by endorsement and delivery, just as negotiable paper, and Sime & Co. having obtained them from Tilden & Breed, as security for a debt from the latter to the former, of thirty-five thousand eight hundred and forty-three dollars and fifty-eight cents, with-

out notice of King's claim, no action lies against Sime & Co. for the stocks, without first paying or tendering the amount of such debt, which the jury finds was not done, and plaintiff does not pretend was even attempted. (*McNeil* v. *Tenth National Bank*, 46 N. Y. 325; *Brewster* v. *Sime*, 42 Cal. 139, and cases cited; 1 Hittel, Art. 943; 2 Parson's Notes and Bills, 42–3; *Goldstein* v. *Hart*, 30 Cal. 375 bottom, 376 top ; *Donald* v. *Suckling*, 1 Law Reports Q. B. 584, 616 ; *Halliday* v. *Holgate*, 3 Exqr. 299; *Johnson* v. *Stear*, 109 E. C. Law, 332; Story on Bailment, Sec. 327; *Leitch* v. *Wells*, 3 Sickles, 585.) The suit of Hyde, assignee, in bankruptcy of Tilden & Breed, against Sime & Co., was a former recovery by King's bailees, Tilden & Breed, and bars this action by King's assignee in bankruptcy. Tilden & Breed, if not the owners of these stocks themselves, were the pledgees of them from King. As such pledgees, they had the right to sue for any conversion of them, and recover the whole value thereof, and such recovery is a good answer to any subsequent suit by the pledgor. (*Treadwell* v. *David*, 34 Cal. 606; *Green* v. *Clarke*, 2 Kern, 343, 354; *Casey* v. *Suter*, 36 M. D. 1; *Chicago R. Co.* v. *Shultz*, 55 Ill. 423; *Betts* v. *Mouser*, Wright's Ohio, 745; *Dillenback* v. *Jerome*, 7 Cow. 300; *City of St. Louis* v. *Bissell*, 46 Mo. 157.)

Counsel on the other side claim that the Hyde suit was only to set aside the transfer of Tilden & Breed to Sime & Co., on the ground of a fraudulent preference, and hence it was not for the same cause of action.

But the action of the Bankrupt Court, under the circumstances, was *quasi in rem.* The possession, right of possession, and legal title of the stocks were in Tilden & Breed, and not in King, on the 31st of August, 1868. At most, King had a mere right to redeem. This property in Tilden & Breed passed to Hyde, as assignee, with all its incidents, and could be adjudicated by the U. S. District Court in Bankruptcy. (*Garwood* v. *Garwood*, 29 Cal. 272; *McCullough* v. *Clark*, 41 Cal. 302; *Canjolle* v. *Ferrie*, 13 Wallace, 474; 2 Smith's Ld. Cases, 7 Amer. ed. pp 808 -822; on Estoppels *in rem,* Duchess of Kingston's case; *Scott* v. *Sherman*, 2 Wm. Blackstone, 978.)

*Calhoun Benham*, in reply to respondent's point that the plaintiff could not recover without a tender, argued that Sime & Co. were not the owners of the note at the trial, and never were; and a payment of it by King to defendants or to Sime & Co. would not have been a satisfaction of the note.   Tilden & Breed did not transfer the note to Sime & Co. as security for their debts to Sime & Co.   And, if they did, the transfer was void, as they were insolvent.   And if they had so transferred it, Sime & Co. could not have claimed its payment, because they were not owners or holders of it at any time after they surrendered it to Hyde.

That there was no presumption in law that Livingstone had a valid pledge.   *Omnia presumuntur rite acta* does not apply to private individuals.

Also, in reply to respondent's point that the stocks were transferable by indorsement and delivery, he said, this is not an open question.   Here was *mala fides* —a taking by fraud. Stocks are not negotiable, though they pass by indorsement and delivery.   Sime & Co. would not have been innocent purchasers or pledgees, *quoad* Tilden & Breed's debt to them, even though the stocks had been negotiable paper, and actually pledged for the old debt, and they had not had notice of King's title.

They parted, according to the theory of this point, with nothing—securities or anything else—as the transfer was a nullity as to Sime & Co., with not even their right to any particular judicial process, which at least is necessary under the rule in California. (*Weaver* v. *Barden*, 49 N. Y. 286; *Morse* v. *Godfrey*, 3 Story, 389, and cases heretofore cited; *Payne* v. *Bensley*, 8 Cal. 260; and *Robinson* v. *Smith*, 14 Cal. 94.

By the Court, CROCKETT, J.:

In the view we take of this case, it will be unnecessary to consider many of the points which have been elaborately discussed by counsel.   There is no conflict in the evidence to the effect that when the stock certificates in controversy were delivered to Sime & Co., as collateral security for the indebtedness of Tilden & Breed, they were properly en-

dorsed, so as to pass by delivery. There was nothing on the face of them to raise a suspicion that they were not the property of Tilden & Breed; and the jury finds, on evidence substantially conflicting, that Sime & Co. received the certificates in good faith, and without notice of King's alleged equities. We, therefore, cannot disturb the verdict on this point. The jury also finds that the certificates were delivered to Sime & Co. with the consent of Tilden &. Breed, as collateral security for the indebtedness of the latter firm to the former, for a sum exceeding thirty-five thousand dollars, no portion of which has been paid or tendered. We think the evidence warranted this finding, and that Tilden & Breed assented to the delivery of the certificates and their hypothecation, as above stated. King had permitted the certificates to remain in the hands of Tilden & Breed, indorsed in such manner that they would pass by delivery, and with nothing on their face to indicate that he had any interest in them, or that they were not the property of Tilden & Breed, whom he has clothed with all the usual *indicia* of the ownership of mining stocks. He had placed them in a position to deal with the stocks as though they were the absolute owners. They could at any time have caused them to be transferred on the books of the respective mining corporations into their own names, and any purchaser or pledgee holding under them could also have done so. If they had no right under the contract between them to sell or hypothecate the stocks except with his consent, he nevertheless clothed them with such an apparent ownership as to mislead the public, and to enable Tilden & Breed to hold themselves out as the owners, and thus defraud innocent persons dealing with them in good faith. Under such circumstances, the party who places another in a position to enable him to practice the fraud should suffer the loss rather than an innocent person who deals with him on the faith of the usual *indicia* of ownership with which the true owner has invested him.

If King had desired to preserve his alleged rights, and to prevent an abuse by Tilden & Breed of the secret trust on which it is claimed they held the stocks, he should have

seen to it that the nature of the trust appeared on the face of the certificates, or in some other method have placed it out of their power to deal with the stocks as their own. In this State, mining stocks, properly indorsed, pass by delivery almost as currently as bank notes; and if the true owner places them, or knowingly allows them to remain in that condition in the hands of another, on some secret trust between them, he, and not an innocent purchaser or pledgee, must bear the loss resulting from a breach of the trust. This point was substantially decided in *Brewster* v. *Sime*, 42 Cal. 139, and we see no reason to doubt the correctness of the proposition. We are, therefore, of opinion that the transaction between Sime & Co. on the one side, and Tilden & Breed on the other, is to be treated, for the purposes of this action, as though the latter had the absolute right as against King, to pledge the stocks on the 31st of August, 1868, when they were hypothecated. It appears, however, that the District Court of the United States, in an action between the assignee in bankruptcy of Tilden & Breed as plaintiffs and Sime & Co. as defendants, held the hypothecation to the latter, under the circumstances, to be a fraud upon the bankrupt law, and, therefore, void as against the other creditors of Tilden & Breed. It, therefore, compelled Sime & Co. to account to the assignee for the value of the stocks. But this cannot improve the status of the plaintiff in this action. Though void under the bankrupt law as against the other creditors of Tilden & Breed, the transaction was valid as against King and every one else; and when Sime & Co. paid to the assignee of Tilden & Breed the value of the stocks, they thereby acquired whatever title the assignee had to them. The effect of the satisfaction of that judgment was to vest the title of the assignee in Sime & Co. But so far as King's rights are concerned, they are no greater than they were before. The case then resolves itself into this: that Sime & Co., in good faith and without notice of King's alleged equities, received these stocks from Tilden & Breed, who were the apparent owners, with the usual *indicia* of ownership, as a pledge to secure the payment of a subsisting debt, which has never been paid or

tendered. Under these circumstances, King's alleged rights, founded on the secret trust between himself and Tilden & Breed, are subordinate to those of the pledgee's. It remains to be considered to what extent, if at all, King's rights are affected by the fact that Sime & Co. sold a portion of the stocks and converted them to their own use, without a previous demand and notice. As we have seen, the stocks are to be deemed as against King, to have been held by Sime & Co. under a valid pledge to secure a debt due from Tilden & Breed.

If Sime & Co. have unlawfully sold and converted the stocks without a previous demand and notice, it was the rights of Tilden & Breed, the pledgors, and not those of King, which were injuriously affected. The contract of pledge was between Sime & Co. and Tilden & Breed; and the right of action for violation of the contract or a breach of duty by the pledgee, was in the pledgors and not in a stranger to the transaction.

It is a sufficient answer to any action by King founded on his supposed rights, if any he has outside of the contract of pledge between Sime & Co. and Tilden & Breed, that the stocks were held under a pledge which was valid as against him, and to which he was a stranger, and that the debt, for which they were pledged has not been paid or tendered.

Among the numerous rulings of the Court below, which the plaintiff claims to have been erroneous, we discover no error which could injuriously affect the plaintiff in the view we have taken of the case.

Judgment and order affirmed.

By the Court, CROCKETT, J., on petition for a rehearing.

A rehearing is asked on the ground that by the uncontradicted testimony of Newcomb, when Sime & Co. received the stocks, and particularly those pledged to Livingstone, Sime had express notice that they belonged to King. The jury found otherwise; and it is insisted that the verdict on this point is not only wholly unsupported by any evidence in the cause, but is directly con-

trary to the testimony of Newcomb. It is to be observed, however, that Sime died pending the action, and his testimony was not obtained. The only evidence of express notice to Sime is to be found in the testimony of Newcomb, relating to a conversation between them, at which no one else was present. The conversation occurred on the day of the failure of Tilden & Breed, and amidst the confusion and excitement naturally attending such an event. It was a conversation between a clerk of the bankrupt firm and one of its creditors for a large sum, eagerly in search of information as to its assets. Evidence of a conversation, resting only in the memory of a single witness, is ordinarily the most unsatisfactory of all evidence. Conversations are so easily misunderstood, particularly under circumstances of excitement, and the human memory is so treacherous, that testimony of this character is held by all courts to be the weakest of all evidence. Moreover, Newcomb was contradicted by Hastings in respect to some of the circumstances attending the giving of the check to redeem the stocks from Livingstone, and on his cross-examination he testified that Sime & Co. "knew from me that the stocks in Livingstone's possession belonged to King, or a portion of them, anyway; but I don't testify, and I have not testified that I told them in so many words that they were King's stocks." Under these circumstances, while there is nothing to impeach his integrity, we cannot say that the jury was not authorized to distrust the accuracy of Newcomb's recollection of the conversation. It was incumbent on the plaintiff to prove notice to Sime & Co. of King's equities; and, under the circumstances already stated, it was for the jury to determine whether the evidence on this point was sufficiently satisfactory to establish affirmatively the fact of the notice. Their finding being in the negative, we would not be justified in setting aside the verdict on the ground that it is unsupported by the evidence. But, waiving this question, we think the judgment ought to be affirmed on another ground. There can be no doubt that Tilden & Breed were entitled to hold the stocks as collateral security for King's note. The note

itself, and the stocks as collateral security for its payment, were delivered to Sime & Co., as collateral security for the indebtedness of Tilden &·Breed. It cannot ·be doubted that Tilden & Breed, the holders of King's note, had the right to pledge it to Sime & Co.; and to deliver to them, as collateral security for the note, the stocks held in pledge to secure its payment. Though this transaction was held to be a fraud on·the Bankrupt Law as against the creditors of Tilden & Breed, and void as against them, it was nevertheless, valid as against King. As to him, Sime & Co. became the lawful holders of. the note, and of the stocks, as collateral security for it. As pledgee of the stocks, holding them for the security for King's· note, it would not have been incumbent on them, upon a redemption of the pledge, to return to the pledgor the same identical certificates which they had received, but it would have been a sufficient· discharge of their duty as pledgees to have kept on hand, and to have been ready at all times, on a redemption of the pledge, to restore to the pledgor certificates of stock corresponding to those received of the pledgor. (*Atkins* v. *Gamble*, 42 Cal. 86; and cases there cited.) The mere .fact, therefore, that Sime & Co. had sold these particular certificates, did not of itself render them liable as for a conversion of the. pledge. If they had continued to· be the holders of King's note, he could not have put them in default, except by a tender of payment and a demand for the stocks; and they would not have been in default, if upon such tender and demand they had offered to restore to them other similar certificates, and had shown that they had at all times been ready to do so. But he could not have maintained the action without a tender and demand. It appears, however, the District Court of the United States held the transaction between Sime & Co. and Tilden & Breed, to be void as against the creditors of the latter, and compelled Sime & Co. not only to surrender the note, but to account for the value of the stocks. The effect of this decree was to adjudge that as between the assignee of Tilden & Breed and Sime & Co. there had been no valid pledge of King's note, and the stocks as collateral

security for its payment. In other words, it restored the note to the assignee with the same rights as though Tilden & Breed had never attempted to pledge it to Sime & Co. But in the meantime, Sime & Co. had disposed of the stocks and converted the proceeds to their own use. In whom was the right of action for the conversion? Was it in King, or in the assignee of Tilden & Breed as the holder of King's note, and as pledgee of the stocks to secure its payment? In *Treadwell* v. *Davis*, 34 Cal. 606, we had occasion to consider the question, whether the pledgee, in an action against a stranger for a conversion of the pledge, was entitled to recover the value of the pledge, or only the value of his special interest in it. We say, "the rule appears to be well settled that in an action by the pledgee against a stranger for the conversion of goods, the plaintiff is entitled to recover the full value of the goods, because he is answerable over to the pledgor for the surplus. But if the goods be converted by the owner, or by any one acting in privity with him, the pledgee can recover only the value of his special interest in the pledge;" and we cite in support of this proposition, Story on Bailment, Sec. 352; *Lyle* v. *Barber*, 5 Bin. 457; *Heyden & Smith's Case*, 6 Coke, 486; *Ingersoll* v. *Van Bokkelen*, 7 Cow. 670; *Pomeroy* v. *Smith*, 17 Pick. 85, to which many other authorities might be added. Assuming this to be the correct rule (of which we have no doubt), the assignee of Tilden & Breed, as pledgee of the stocks, was entitled to recover their full value from Sime & Co., who, on the plaintiff's theory, were strangers to King, and not acting in privity with him. The complaint charges them to be naked wrong doers, who wrongfully and fraudulently obtained possession of the stocks, without the knowledge or consent either of King or Tilden & Breed; and the plaintiff now contends that they wrongfully and unlawfully obtained possession of the stocks, and converted them to their own use, with full notice of King's rights. If this be so, they were wrong doers, and could not have acted in privity with King. In an action against them, the assignee of Tilden & Breed, as pledgee of the stocks, was therefore entitled to recover their full

value, as he appears to have done. The effect of this recovery and the satisfaction of it by Sime & Co., was to vest in them a title to the stocks or their proceeds. In any event, it cannot be doubted that the assignee of Tilden & Breed, as pledgee of the stocks, was entitled to recover the value of his special interest in them; and it appears that the stocks, at the time of their conversion, were worth much less than the debt for which they were pledged to Tilden & Breed. This value was ascertained by the judgment of the Court, and was paid by Sime & Co. to the assignee of Tilden & Breed. No interest was left in King on which he or his assignee could maintain an action against Sime & Co. The point is made that the proceedings in the Bankruptcy Court were not admissible in evidence under the pleadings; but we are of a contrary opinion.

The petition for a rehearing is denied.

Mr. Justice McKINSTRY did not express an opinion on the application for a rehearing.

Mr. Chief Justice WALLACE, being disqualified, did not participate in the decision of this case.