MORRIS & WHITEHEAD v. EAST SIDE RY. CO. et al.

MAXWELL v. SAME.

(Circuit Court of Appeals, Ninth Circuit.    October 1, 1900.)

No. 562.

1. PLEDGES—VALIDITY OF SALE—FRAUD AND COLLUSION.

A pledgee of the bonds of a street-railroad company, securing notes given by the owners of the stock of the company amounting to something more than half the face value of such bonds, sold the same at public sale, after due notice to all parties interested; the makers of the notes and the company having become insolvent and made default in the payment of interest. At the sale the bonds were purchased by a bank, which had acquired other claims against the company, for about $5,000 less than the amount due on the notes secured. This sum the bank also paid, taking an assignment of the notes. By a previous arrangement, the bank, which was of good financial standing, borrowed from the

pledgee something over 90 per cent. of the amount it paid for the bonds, giving its own note therefor, secured by a pledge of the same bonds. The direct testimony of the parties showed without contradiction that the pledgee had no interest, direct or indirect, in the purchase of the bonds at the sale, and that its only purpose in assisting the purchaser by a loan was to obtain part payment of its debt, and the substitution of a solvent for an insolvent debtor for the remainder. *Held* that, in view of such evidence, the facts were not sufficient to impeach the good faith of the sale, and to warrant the court, in a suit to foreclose the mortgage securing the bonds, in disregarding it as fraudulent. and limiting the recovery to the amount of the original debt, to which such bonds were collateral.

2. SAME—CONDITIONS OF SALE.

The delivery by a corporation of its bonds to a third person for the express purpose of enabling him to pledge the same as security for a loan to be obtained for the benefit of the corporation carries with it implied authority to make the hypothecation on the terms usual in such cases as to the manner of selling the bonds in case of .default in payment of the debt.

3. SAME—LAW GOVERNING.

Where bonds are pledged in another state from that in which the debtor resides to secure notes there payable, the law of such state governs as to the sale of the security.

4. SAME—MUTUAL MISTAKE.

A mutual mistake by which bonds separately pledged to secure two different notes to the same creditor are applied in each case to the wrong note is immaterial, and does not affect the validity of the pledges, where, on a sale of the bonds, those constituting the separate pledges do not in either case realize enough to pay the smaller note.

Appeal from the Circuit Court of the United States for the District of Oregon.

For former opinion, see 95 Fed. 13.

Ralph E. Moody, Cotton, Teal & Minor, and W. S. Goodfellow, for appellants.

Zera Snow and W. A. Cleland, for appellees.

Before GILBERT and ROSS, Circuit Judges, and HAWLEY, District Judge.

ROSS, Circuit Judge. The defendant East Side Railway Company is a corporation organized by G. A. and James Steel for the purpose of building and operating certain lines of railway and street railway in and about Portland, Or. G. A. Steel became its president and James Steel its vice president, treasurer, and general manager. Each of them was a director of the corporation, the only other director being John B. Cleland, who was also its secretary, and who held but one share of the stock of the corporation, and that only to qualify him as director. Indeed, it appears that at all the times herein mentioned the two Steels were the real owners of all of the stock of the railway company, 100 shares of which, however, were hypothecated by them as security for an indebtedness to the Bank of British Columbia, and for that purpose stood in the name of George Good as trustee, whose proxy, however, James Steel held. It appears that the company built at least some of the lines of railway for which it was organized, and acquired various rights of way, rolling stock, power house, and other necessary and appurtenant property. Under

resolution of its board of directors, 250 bonds of the par value of $1,000 each were authorized to be issued, secured by a mortgage on its property, executed to the Security Savings & Trust Company of Portland as trustee, for the benefit of the holders of the bonds. One hundred and twenty-five only of those bonds were issued, and they were issued and delivered to G. A. and James Steel, who pledged them to the German Savings & Loan Society of San Francisco, Cal., as security for money borrowed by them from that bank at different times, and aggregating about $83,000. The case shows that this money was used by the Steels in and about the building up and operation of the lines of railway mentioned, and that, more money being needed for that purpose, the directors of the company adopted a resolution providing for the issuance of 300 bonds of the par value of $1,000 each, to be secured by a mortgage upon all of the property of the company to the Security Savings & Trust Company of Portland as trustee, to be used in replacing the bonds of the first issue so far as necessary, and the remainder in securing additional money. In pursuance of that resolution, 300 bonds, numbered, respectively, from 1 to 300, both inclusive, were issued on March 1, 1893, secured by a mortgage on all of the property of the company to the Savings & Trust Company as trustee. These bonds were certified by the trustee, and delivered to the railway company. Of them, 125, numbered from 1 to 125, both inclusive, were delivered to James and G. A. Steel in lieu of the 125 bonds of the first issue thereupon surrendered and canceled, and bonds numbered from 131 to 153, both inclusive, were, also for value, delivered to James and G. A. Steel, and bonds numbered 126 to 130, both inclusive, were, for value, delivered to Eva P. Steel, who thereafter authorized James and G. A. Steel to pledge them to the German Savings & Loan Society of San Francisco, as hereinafter stated. The findings of the court below are to the effect that the remaining bonds of the last-mentioned issue, numbered from 154 to 300, both inclusive, "were by the East Side Railway Company delivered to James Steel and G. A. Steel, with authority and for the sole purpose of permitting the pledge of the same as security for the loan of $80,000 made in their names for the benefit of the East Side Railway Company." By each of the 300 bonds the railway company promised to pay to the bearer, or, in case the bond should be registered, then to the registered owner thereof, the sum of $1,000 in United States gold coin of the then standard weight and fineness, at the office of the trustee in the city of Portland on the 1st day of March, 1923, together with interest thereon at the rate of 6 per cent. per annum, payable semiannually, in like gold coin, on the 1st days of March and September in each year, on the presentation and surrender of the respective interest coupons annexed to the bonds, and to pay the same at the office of the Security Savings & Trust Company in Portland. The mortgage securing the bonds was duly recorded in the office of the county recorder of the county in which the property was situated. In addition to the then existing indebtedness of $83,000 due from the Steels to the German Savings & Loan Society, that banking institution agreed to, and did, on April 1, 1893, loan them $80,000.

The old indebtedness was on that day evidenced by a new note exe-
cuted by G. A. and James Steel for $83,000, with interest thereon
at the rate of 7 per cent. per annum, payable monthly; and for the
additional loan of $80,000, at like interest, they also executed their
promissory note, bearing the same rate of interest. As security
for the payment of these notes, both of which were made payable
in San Francisco, Cal., the Steels, by instruments in writing, pledged
all of the 300 bonds issued by the East Side Railway Company. The
findings of the court below are to the effect that the intention of
the parties was that the bonds numbered from 1 to 153, both inclu-
sive, should be given and held as security for the $83,000 note, and
that the bonds numbered from 154 to 300, both inclusive, should
be given and held as security for the $80,000 note, but that by mu-
tual mistake of the parties the reverse occurred. Each of the con-
tracts of pledge appointed the Savings & Loan Society attorney in
fact of the pledgor, with power of substitution, and the pledgee
was thereby instructed, directed, and authorized to sell at any time,
with or without notice, at its option, and without any demand upon
the debtor for payment or increase of security, the whole or any
part of the security, and to sell the same either at public or private
sale, at its discretion, and to deliver the same to the purchaser or
purchasers thereof; but the findings are to the effect that there
was no express authority given by the East Side Railway Company
to the Steels to insert those provisions in the contract of the pledge.
In November, 1893, the railway company was indebted to the North-
west General Electric Company in the sum of $37,639.95 for goods,
wares, and machinery sold and delivered, for which, on the 9th day
of that month, the railway company executed to the electric com-
pany its promissory note for the sum mentioned, with interest; and
on the same day the railway company executed to the Commercial
National Bank of Portland, Or., its promissory note for $29,289.37,
with interest, for money theretofore loaned by that bank to it. On
the same day the railway company executed to the electric com-
pany a mortgage upon all of its property for the security of the
two last-mentioned notes and for the purpose of securing payment
to the electric company of "any and all sums of money which might
thereafter become due to it from the said railway company, not ex-
ceeding $25,000 in all, for apparatus, machinery, equipment, mate-
rials, and supplies" which the electric company might thereafter
furnish to the railway company. The railway company was also
indebted to various other persons and firms in various sums of money,
upon some of which claims suits were thereafter brought, and the
property of the railway company attached. Thereupon, and on the
8th day of December, 1893, the electric company commenced the
present suit for the foreclosure of the second mortgage upon the
property in question, namely, the mortgage executed November 9,
1893, making parties defendant thereto the East Side Railway Com-
pany and the unsecured creditors mentioned, but not making a party
thereto the first mortgagee, namely, the Security Savings & Trust
Company of Portland. Upon the commencement of the suit the
court appointed a receiver of all of the property of the defendant

railway company, who qualified as such receiver, and took possession of the property, and continued to hold and operate it. Being without means to defray the expense of doing so, the receiver was, by an order of the court, authorized to issue receiver's certificates for the necessary money, which was done from time to time, and which were made a lien upon the property paramount to the lien of the mortgage. For some time the Steels paid the interest upon the eighty-three and the eighty thousand dollar notes, respectively, executed by them to the German Savings & Loan Society, and received a surrender of the appropriate interest coupons attached to the respective bonds. After a while they became unable to pay the interest, and the German Savings & Loan Society wanted the payment of both principal and interest. The Steels were making efforts in several directions to raise the money. Among others, they asked, in July, 1897, the banking corporation of Morris & Whitehead, of Portland, to purchase the bonds of the East Side Railway Company; and at the time they furnished them a detailed statement of the company's affairs, its earnings, expenses, and business plans. The company's property was still in the hands of the receiver appointed in the suit instituted by the electric company to foreclose the second mortgage upon it. One of the Steels suggested to Morris the purchase by his firm of the electric company's mortgage. Morris looked the property over, and talked favorably in respect to the proposition made to him by the Steels, but, without consummating any arrangement with them, Morris & Whitehead, on March 31, 1898, purchased of the electric company its mortgage, and were thereupon substituted as parties complainant in the suit. In the meantime the Steels, continuing to be unable to pay the principal or interest due on the eighty-three and eighty thousand dollar notes, respectively, entered into an agreement in writing on the 7th day of May, 1897, with the Savings & Loan Society, whereby the rate of interest upon those notes was raised to $8\frac{1}{2}$ per cent. per annum in consideration of the extension of the time of payment thereof. Time ran on, and the Steels were still unable to pay either principal or interest, and the Savings & Loan Society became desirous of collecting the amount of its loans. What it did was this: It assigned, on April 26, 1898, the two overdue notes and the bonds securing the same to one Albert Meyer. On the next day Meyer caused to be mailed to the Steels, the East Side Railway Company, and its various creditors a demand of payment of the notes, and notice of public sale of the bonds to take place at 11 o'clock a. m. of the 11th day of May, 1898, at the main entrance to the Merchants' Exchange Building on the south side of California street, between Montgomery and Leidesdorff streets, in the city and county of San Francisco, Cal., to the highest bidder for cash in United States gold coin. The notice of sale was also published in a San Francisco paper of general circulation 13 times consecutively, commencing April 27, and ending May 11, 1898, and was posted in three public places in the city of San Francisco, and was also personally served by the Portland agent of the Savings & Loan Society, B. Goldsmith, together with a demand for the payment of the principal and interest

due on the notes, on the Steels, the railway company, and its various creditors. No payment having been made, the bonds were sold at public auction, at the time and place stated in the notice, to Morris & Whitehead, who were the highest and only bidders therefor, for $173,589. G. A., James, and Eva P. Steel were personally present at the sale. The purchasers thereupon gave Meyer their check for $10,000 "to bind the bargain," and on the same or succeeding day paid him the balance of the purchase price, to wit, $163,589, by check drawn by Wells, Fargo & Co. in favor of F. S. Morris, and by him indorsed to Meyer. Meyer paid the German Savings & Loan Society by his own check on the London & Paris American Bank, which was collected a day or two after the sale. The money represented by the Wells, Fargo & Co.'s check was obtained upon a short loan from Wells, Fargo & Co. to Morris & Whitehead, for which the bonds were pledged as security; and that loan was paid "a day or two after the sale," with money borrowed by Morris & Whitehead from the German Savings & Loan Society upon the security of the bonds, in pursuance of an arrangement made some days before the sale. Meyer, to whom the bonds and notes had been transferred by the German Savings & Loan Society, transferred them on the day of the sale to Morris & Whitehead, the purchasers thereof, and reassigned the notes to the Savings & Loan Society, which, on the following day, to wit, May 12th, assigned the notes to Morris & Whitehead in consideration of the payment of $4,970.10, which sum was still due on the notes under the contract of May 7, 1897, providing for the increased rate of interest, after deducting the price for which the bonds were sold. In the meantime the German Savings & Loan Society and the Security Savings & Trust Company had been made defendants to the original bill filed herein for the foreclosure of the second mortgage upon the property in question, but neither of them had answered therein, and neither of them, nor the successor of the Security Savings & Trust Company, hereinafter mentioned, ever did answer or otherwise plead to the original bill. After the purchase of the bonds by Morris & Whitehead, they caused, under and by virtue of a provision in the mortgage securing those bonds, the removal of the Security Savings & Trust Company as trustee thereunder, and the appointment in its stead of A. L. Maxwell as such trustee, who was substituted as defendant to the original bill in place of the Security Savings & Trust Company, and who, as such trustee, made demand for the payment of the interest upon the bonds which was in default, and, payment thereof being refused, he elected to declare the principal of the bonds due, and gave due notice of such election, having been theretofore requested so to do by Morris & Whitehead and the German Bank, together with the request that he proceed to enforce payment thereof. Thereupon Maxwell filed in the suit a cross bill for the foreclosure of the first mortgage, making all of the former parties to the suit parties thereto, together with the various other parties. Neither G. A. nor James Steel was made a party to either bill, and they have not become parties to the suit in any way.

The principal question in the case relates to the validity of the sale of the bonds made in San Francisco. The court below held it valid except to a limited extent, saying, in its opinion:

"The German Savings & [...] Society was not seeking to realize upon its securities, but to effect a transfer of the title of the bonds held by it to Morris & Whitehead. The sale, if it can be so called, was not a cash sale, as advertised, except as to the [...], which, when the amount involved is considered, appears to be too small a sum to have operated as an inducement for what was done. The debt of the Steels, except as to $4,970, was simply transferred to Morris & Whitehead. I am satisfied that the solvency of these bankers was not an inducement for the transfer. The security for the debt was the bonds. The German Savings & Loan Society was merely playing into the hands of Morris & Whitehead, and, if the former has no pecuniary share in the title derived from the sale, yet its conduct has all the consequences of such an interest to the debtors whose property was sold. But whether the pledgee may buy at his own sale is not considered. It is enough to defeat the sale that it was contrived between the seller and buyer in order to get the pledgor's title at a sacrifice of his interest, with that result. I am of the opinion that the purchasers of these bonds are duly entitled to a decree for the amount of the debts for which the bonds were pledged and interest and costs, and this conclusion is based upon the fact that the sale to Morris & Whitehead was prearranged between the parties, that it was contrived between them as a means of acquiring the property pledged, and that it is immaterial whether the German Savings & Loan Society have any interest in the sale or not. In reaching this conclusion I assume, from the earning capacity of the railway as shown by what appears in the case, that the bonds have a value greatly in excess of the price bid for them at the sale. If this is so, it is unconscionable that the mortgagors, or, what is the same thing, the other creditors, shall lose this excess by the expedient of this sale, while some $5,000 of the original debt remains unsatisfied in the hands of the purchasers at the sale. If it shall turn out that the price bid is substantially all that the bonds are worth, then the considerations upon which this decree is based will fail. In that case the sale could not have prejudiced the mortgagors and other creditors, but in that case the purchasers at the sale will not be prejudiced by the decree. In any event, they will have their debt and interest, whether that is sufficient to absorb the property or not; and it is all they are equitably entitled to have."

We are unable to concur in these views of the court below. We find nothing in the record justifying the conclusion that Morris & Whitehead, in purchasing the bonds in question, were in any way acting for the German Savings & Loan Society, or that the savings and loan society had any interest whatever in that purchase. Those of the officers of that bank who testified in the cause testified explicitly that the bank had no such interest; and the circumstances of the case, so far from impeaching or tending to impeach that testimony, in our opinion strongly corroborate it. The bank had been trying for a long time to collect the loans. The borrowers had been unable to pay either principal or interest. Both of them, as well as the railway company, all of whose stock, as has been said, they really owned, were insolvent, and hard pressed for money. All of the property of the railway company was in the hands of a receiver appointed by the court, who, for lack of means to operate it, had been compelled to issue, under the orders of the court, receiver's certificates, which were made prior liens to the mortgage. Under such circumstances, what more natural than that the savings and loan society should be anxious to realize upon its loans, and to aid any one worthy of confidence found willing to buy the bonds? Mor-

ris & Whitehead, a Portland banking corporation, had examined the property of the railway company, and no doubt satisfied itself that by judicious management the prop... could be made to pay. It was a corporation of good financial ...ng, according to the evidence in the case, and one to which ...r of Wells, Fargo & Co. was willing to and did loan $163,589 ... purpose of enabling it to buy the bonds in question. It m... ...d probably is, true that the bank of Wells, Fargo & Co. was 000'0I$ that its loan would be repaid within a few days by money ... Morris & Whitehead by the savings and loan society. ... see nothing illegal or wrong in that, if it be true. The sa... ...nd loan society had the legal and moral right to make such loan to Morris & Whitehead; and that it was to its interest to do so seems clear, for they paid on account of the purchase of the bonds $10,000 out of their own funds, and, as the amount of that purchase was $4,970.10 less than the amount due upon the Steel notes, they had to and did, in order to acquire the notes as well as the bonds, pay to the Savings & Loan Society the additional $4,970.10. The result of the transaction, therefore, was that the Savings & Loan Society collected $14,970.10 in money on the eighty-three and eighty thousand dollar notes of the Steels, and got for the balance the note of a responsible banking firm, secured by precisely the same bonds. In all of this we see nothing to indicate any contrivance between the savings and loan society and Morris & Whitehead to acquire the pledgor's title to the bonds at a sacrifice of their interest, nor, indeed, anything in any manner illegal or unconscionable. Although the contracts of hypothecation expressly authorized the savings and loan society to sell the bonds without demand of payment and without notice, and to make such sale either publicly or privately, personal demand of payment of the amount due upon the notes was made, and public and personal notice was given to all the parties interested of the sale of the bonds, and at that public sale the principal officers of the railway company and the real owners of all of its stock, as well as the makers of the notes and Eva P. Steel, were personally present to protect their interests. They could have done so by paying the amount due upon the notes, or by finding some one who would pay more for the bonds than they sold for. But nothing of the sort was done, and it is evident from the record that the Steels and the railway company were wholly unable to pay the money due to the savings and loan society. The contracts of hypothecation, as has been said, expressly authorized the sale of the bonds either at public or private sale. It is contended on the part of the appellees that, in so far as concerns the bonds numbered 154 to 300, both inclusive, claimed to have been the property of the railway company, such provision in the instrument of hypothecation was unauthorized; but the findings of the court below are to the effect that the railway company delivered to James and G. A. Steel those bonds for the very purpose of pledging them as security for a loan of $80,000 to be made in their names for the benefit of the railway company. The general authority to make such pledge carried with it the power to do all things necessary or appropriate to the exercise of the power

expressly granted. There were no limitations imposed upon them, and in executing the contract of hypothecation in the form usual in such cases they were clearly within their implied powers. Mechem, Ag. §§ 371, 317; Lane v. Beard, 8 How. 451, 12 L. Ed. 1151; Huntley v. Mathias, 90 N. C. 101; Craighead v. Peterson, 72 N. Y. 279. But, apart from the authority conferred by the contracts of hypothecation, the law gave the pledgee the power to sell the bonds pledged as security, under the circumstances disclosed by the record in this case. The notes, as has been said, were made payable in California, and therefore the law of California in respect to the matter governs. Andrews v. Pond, 13 Pet. 78, 10 L. Ed. 61; Dygert v. Trust Co., 37 C. C. A. 389, 94 Fed. 913; Lee v. Kelleck, 33 N. Y. 615; Tillotson v. Tillotson, 34 Conn. 355, 367; Civ. Code Cal. §§ 2987, 3000–3002, 3010. Sections 3000–3002, 3005, and 3006 of the Civil Code of California are as follows:

"Sec. 3000. When performance of the act for which a pledge is given is due, in whole or in part, the pledgee may collect what is due to him by a sale of property pledged, subject to the rules and exceptions hereinafter prescribed.

"Sec. 3001. Before property pledged can be sold, and after performance of the act for which it is security is due, the pledgee must demand performance thereof from the debtor, if the debtor can be found.

"Sec. 3002. A pledgee must give actual notice to the pledgor of the time and place at which the property pledged will be sold, at such a reasonable time before the sale as will enable the pledgor to attend."

"Sec. 3005. The sale by a pledgee, of property pledged, must be made by public auction, in the manner and upon the notice to the public usual at the place of sale, in respect to auction sales of similar property; and must be for the highest obtainable price.

"Sec. 3006. A pledgee cannot sell any evidence of debt pledged to him, except the obligations of government, states, or corporations; but he may collect the same when due."

The record in the case shows that these provisions of the California Code were complied with on the part of the savings and loan society.

In respect to the mutual mistake stated in the findings to have been made by the parties in pledging bonds numbered 154 to 300, both inclusive, as security for the $83,000 note, instead of the $80,000 note, it is sufficient to say that all of the bonds were alike in all respects, and under the terms of the mortgage were entitled equally to its security, and were, therefore, of the same value, as was evidenced by the sale in question, at which, although each bond was offered for sale separately and altogether, there was no difference made between the bonds in the bidding. In such case the identity of the bonds becomes immaterial. Atkins v. Gamble, 42 Cal. 86; Thompson v. Toland, 48 Cal. 116; Krouse v. Woodward, 110 Cal. 643, 42 Pac. 1085. The pledge of bonds numbered 154 to 300, both inclusive, was certainly valid to the extent of $80,000 and interest, as provided for; and as the sale disclosed no difference in the value of the bonds, and the whole of the 300 brought less by $4,970.10 than the aggregate amount due upon the two notes, it is obvious that bonds 154 to 300, both inclusive, brought less at the sale than the amount for which they were properly pledged. We are of opinion that the record shows Morris & Whitehead to be the legal and

104 F.—27

equitable owners of the whole of the 300 bonds in suit, and, as they were secured by a first mortgage upon all of the property of the defendant railway company, that they are entitled to a decree for the full amount of the face value of the bonds, together with the interest due thereon, and to a decree of foreclosure and sale of the mortgaged property as against all of the defendants to the cross bill, subject to such receiver's certificates as have proper precedence over the mortgage lien.

The judgment is reversed, and the cause remanded to the court below, with directions to enter a decree in accordance with the views here expressed